# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs August 19, 2025

## STATE OF TENNESSEE v. MATTHEW JAMES WOOD

**Appeal from the Criminal Court for Polk County**
No. 20CR86   Andrew M. Freiberg, Judge
_____

**No. E2024-00678-CCA-R3-CD**
_____

Defendant, Matthew James Wood, appeals from his Polk County Criminal Court convictions for attempted possession with intent to sell or deliver more than 0.5 grams of methamphetamine; possession of a firearm with the intent to go armed during the attempted commission of a dangerous felony; and possession of drug paraphernalia, for which he received a total effective sentence of seven years' incarceration. Defendant contends that: (1) the trial court erred by denying Defendant's motion to suppress evidence obtained from the traffic stop; (2) the trial court erroneously admitted text messages in violation of Tennessee Rule of Evidence 404(b); (3) the trial court erroneously restricted Defendant's cross-examination of a police officer; and (4) the evidence of his intent to sell or deliver is insufficient to support his convictions for attempted possession of methamphetamine and possession of a firearm with the intent to go armed during the attempt to commit a dangerous felony. Following a thorough review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JOHN W. CAMPBELL, SR., and MATTHEW J. WILSON, JJ., joined.

Donald Leon Shahan, Jr. (at motion for new trial and on appeal), District Public Defender; Larry D. Wright (at motion in limine hearing), Assistant Public Defender; and Todd W. Gee (at motion to suppress and trial), Cleveland, Tennessee, for the appellant, Matthew James Wood.

Jonathan Skrmetti, Attorney General and Reporter; Benjamin L. Barker, Assistant Attorney General; Stephen Hatchett, District Attorney General; and Sean S. Boers and Paul O. Moyle IV, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I. Factual and Procedural Background**

This case arises from a December 1, 2019 traffic stop of Defendant by the Polk County Sheriff's Office ("PCSO"). The July 2020 term of the Polk County Grand Jury issued an indictment charging Defendant with possession with intent to sell or deliver more than 0.5 grams of methamphetamine; possession of a firearm with the intent to go armed during the commission of a dangerous felony; possession of drug paraphernalia; and violation of the light law[1]. *See* Tenn. Code Ann. §§ 39-17-425, -434, -1324; 55-9-402(c).

The State subsequently filed a pretrial motion to admit Defendant's text messages pursuant to Tennessee Rule of Evidence 404(b). Defendant also filed a pretrial motion to suppress the evidence received as a result of the traffic stop. The trial court held a hearing on each motion.

*A.      Pretrial motion in limine*

The trial court held a pretrial motion hearing addressing the State's "Motion In [Limine] Number One 404(b) Prior Drug Sales[.]" Although the motion is not part of the record on appeal, the trial court's order on the motion recounted that the State sought to admit ninety-six text messages from Defendant's cell phone to prove Defendant's mental state at the time of the traffic stop; his intent; completion of the story; and the existence of a common scheme or plan. Defendant responded that the text messages sent by third parties were hearsay; that the non-hearsay messages did not prove prior bad acts by clear and convincing evidence; and that the danger of unfair prejudice outweighed their probative value. Defendant noted that some of the messages referred to drugs other than methamphetamine and that others were not incriminating.

At the hearing, the trial court considered multiple text message conversations, which had been included in the State's prior response to Defendant's motion to reduce bond. Relevant to this appeal, at the hearing, the trial court concluded that the following messages were admissible:

---

[1] The State entered a nolle prosequi as to the violation of the light law count prior to trial.

| Sent by | Date | |
|---|---|---|
| Matt Wood | 11-16-19 | I can't find a woman I the only man in polk county with ½ pound of s**t and can't get a dope w**re to f**k me |
| Matt Wood | 10-18-19 | Pull me some moss I'll pay you $10 a full hundred pound sack if you need hundred pound sacks I got them I don't want leaves and sticks I need good thick perfict quality clean product I can pay cash or s**t what ever you prefer my s**t is good quality product straight from a bathtub lab in the remote Tennessee mountains before the Mexicans put their cut in it |
| Donald Brown | 10-10-19 | Need any zs |
| Matt Wood | 10-10-19 | I got some old school red rock crank from the 90s in the ground |

Relative to the first message (the "can't find a woman" message), the State averred that its proof at trial would include that "s**t" was slang for methamphetamine. The trial court found that the "can't find a woman" message provided clear and convincing evidence of the prior act and that it was offered to prove "motive, intent, [and] preparation[.]" The court noted that it was also a statement by a party opponent. However, the court excluded the last three words of the message, finding that they were "more prejudicial than probative." The court also excluded other messages in the same conversation.

Relative to the second message (the "bathtub lab" message), the trial court found that Defendant's statement was not unfairly prejudicial. The court found that the discussion of "paying cash or good quality product straight from bathtub [labs] before Mexicans put their cut in it" had a "high" probative value relevant to intent "because that's talking about a delivery or exchange for moss."[2]

Relative to third message (the "need any zs" message) and fourth message (the "red rock crank" message), the trial court stated that it would admit Mr. Brown's message and Defendant's response.

The parties also discussed a fifth message (the "stockpiling" message), which Defendant sent to Mr. Brown on October 10, 2019, in response to the "need any zs" message; it was sent prior to the "red rock crank" message. The "stockpiling" message read, "I would have to go dig it up so I have 3 it's the older stuff I paid more for it I stock

---

[2] The prosecutor noted that the reference to moss was to the plant and was not slang for drugs.

- 3 -

piled the s**t for hard times I knew price would go back high as f**k just like the stock market." The following exchange occurred:

THE COURT: But what's -- from context it's really [Mr.] Brown soliciting [Defendant]. Need any. Like I'll give you some, but then that would be a purchaser. What do you think when you talk about the material issue being intent –

[THE STATE]: Sure.

THE COURT: -- the element, he's being solicited. What's the context?

[THE STATE]: Your Honor, look at it through the prism of an investment. Let's use [D]efendant's own analogy on this. He bought it just like the stock market at a low price knowing it would increase. You make an investment in something with the plans to one day turn around and res[ell] that investment for a profit.

[D]efendant in this case is saying that he has old stuff in the ground. He paid a little bit for it. It's red rock crank from the '90s. The officers would testify what that means, and that means methamphetamine. He's basically saying, no, I got my stuff . . . . I'm waiting on it to appreciate in value.

. . . .

. . . I would submit, Judge, that it's actually indicative of it not being . . . simple possession for this reason: If it was, then why would he be holding onto it if he's intending to consume it? It's sort of like if I buy a pie today and I want to consume the pie, I'm going to start eating it whenever I feel like it. I'm not going to buy the pie, keep it in the refrigerator and say I'm waiting on the price to go sky high so that I can then eat it. What would be the purpose of that? It would serve none.

I understand the [c]ourt's concern . . . , but I would submit that it does go toward his intent to . . . sell or deliver it on a later date.

. . . .

THE COURT: I'm going to agree with the State on two passages. The admissibility of a statement from [Mr.] Brown is only admissible for context

- 4 -

to [D]efendant's admissible statement, so it's background context. The passage at October 10, 2019, at 8:00 and 46 second[s] p.m., [Mr.] Brown to [Defendant] -- all of this, of course, subject to authentication, admissibility. But need any Zs is just context, and then the passage of October 10, 2019, at 8:05 p.m., 11 second[s], I got some old school red rock crank from the '90s in the ground.

The trial court reiterated that it would admit "just those two." The court also briefly considered additional conversations and found that they were inadmissible.

The trial court later entered a March 20, 2023 written order, in which it noted the messages that would be admitted and stated that it had excluded ninety proposed text messages. The court included the date, time, and substance of the "can't find a woman," "bathtub lab," and "need any zs" messages. The court included the last three words of the "can't find a woman" message. However, the written order did not include the "red rock crank" message, and the court instead set out the date, time, and substance of the "stockpiling" message.

### B.  *Pretrial motion to suppress*

At the suppression hearing, PCSO patrol Sergeant David Barnes testified that, on December 1, 2019, he was on patrol when Defendant, who was driving a red Polaris RZR vehicle, pulled out in front of him. Sergeant Barnes noticed that the vehicle's right brake light was not functioning and initiated a traffic stop. Sergeant Barnes stated that Defendant was "unusually nervous" and that his hands were "shaking very badly" as he handed Sergeant Barnes his documentation. Sergeant Barnes noted that Defendant's demeanor made him nervous.

Sergeant Barnes testified that his practice was to ask if any weapons were in the vehicle and that Defendant responded, "I've got a knife and stuff." When Sergeant Barnes asked what Defendant meant by "stuff," Defendant responded, "I've got a loaded pistol in my right pocket." Sergeant Barnes asked Defendant to exit the vehicle and removed the pistol. Sergeant Barnes testified that he asked Defendant if he had anything illegal on his person, that Defendant responded that he had a glass methamphetamine pipe in his left pocket.

On cross-examination, Sergeant Barnes testified that he had conducted hundreds of traffic stops and that he regularly encountered nervous people. He agreed that, at the time of the stop, he was only stopping Defendant for a traffic infraction. Sergeant Barnes acknowledged his preliminary hearing testimony that he turned on his body camera when he left his police cruiser. He clarified that, to the extent his testimony indicated the entire

traffic stop was recorded, he was mistaken. He explained that, at the time, PCSO officers were equipped with body cameras that sometimes did not record when they should. Sergeant Barnes clarified that the recording did not start immediately despite his efforts to turn on his camera.

Upon examination by the trial court, Sergeant Barnes stated that, after Defendant produced the methamphetamine pipe, he asked Defendant, "Are you sure you don't have any meth to go with this meth pipe?" Defendant responded affirmatively and stated that it was in his right "cargo pocket."

Defendant called PCSO Detective Cody Day as a witness. Detective Day testified that he handled civil asset forfeiture cases and that Defendant's vehicle was seized and sold at auction through the online "GovDeals Marketplace." Detective Day composed a listing description for the auction, which stated, "Both headlights and taillights function properly." When asked whether he had performed "a full inspection" of the vehicle, Detective Day stated that he would call it "a walk-around." Detective Day said that he replaced the battery because it had been sitting for a while. He agreed that a short video[3] of the vehicle showed the right passenger's-side taillight working. Detective Day did not know whether the taillight and brake light shared the same bulb. He noted that he was unfamiliar with this type of vehicle and had never worked on one. Detective Day estimated that he took the video around the middle or end of March 2022. He stated that, if he had known a brake light was out, he would have reported it on the listing. He said, though, "I don't believe that's an item that we tested during this inspection." Detective Day stated that they drove the vehicle but that he did not have anyone stand behind it to check the brake lights.

On cross-examination, Detective Day testified that the video depicted the empty vehicle parked with the engine running and that it did not show whether the brake light was working. He agreed that the vehicle sat in the impound lot for about three years. Detective Day stated that he did not check the vehicle's wiring or "grounds" for electrical "shorts" or blown bulbs. He stated that he and another officer also washed the vehicle, cleaned it, and put air in the tires. Detective Day did not know whether the brake lights were working on December 1, 2019.

Defendant argued that Sergeant Barnes's testimony about the reason for the stop was not credible because he had admitted that his preliminary hearing testimony was mistaken. Defendant noted Detective Day's description of the working taillights on the GovDeals Marketplace and averred that the State had not proven that the stop was "legal."

---

[3] The suppression hearing exhibits, which consisted of the GovDeals Marketplace listing and video, were not included in the record on appeal.

The trial court orally denied the motion and, relevant to this appeal, found as follows:

I am going to fully accredit the testimony of both [Sergeant] Barnes and Detective Day. I thought they both had a good appearance and demeanor, both exhibited a good level of character and respectability. And I also felt like they were simply conveying truth. They presented as very fair and unbiased, unmotivated . . . . so I accredit their testimony.

. . . .

I don't find any disputes in the proof; so I do accredit that this was a probable cause stop for an inoperable brake light on this Polaris.

. . . .

As it relates to the brake light, Detective Day just always presents as an extremely honest and fair individual . . . . And he testified, and I accredit it, ["]I don't know if it was working or not. I'm dealing with a vehicle three years later after it sat on the impound lot. I cleaned it up. The video which I observed was in daylight hours.["] There's nothing about the video that indicates a flashing light on, not on, and he just didn't check out the vehicle in full.

The parts that he did check out . . . to try to post this to sell it on GovDeals Marketplace, he didn't observe it, but that's not the same thing as saying it was operable at the time of his inspection which is removed and completely in officer custody and care since December l[], 2019. So, again, that's why I don't find there to be discrepancies in the proof.

It would be one thing if it were fully checked out, but I'm just going to accredit that Detective Day . . . did not check it out in full and was just trying to get the best price on the GovDeals Marketplace. So I don't think that's the same thing as Detective Day saying it was. In fact, he testified I didn't check it out. So I don't find anything there.

As it relates to the camera . . . . I find [Sergeant] Barnes to be credible. He just said we had issues with those during those times. I put it on, it says it's on, it just wouldn't always work. This isn't the first time they had issues with that system.

. . . .

So I don't find any suspicions based upon the way -- the video not being recorded. I accredit the testimony that this system at the time had issues. He turned it on, it said it's on, it just didn't work.

## C.    Trial

At trial, Tennessee Bureau of Investigation (TBI) Special Agent Dawn Mackey, an expert in digital forensics, testified that the PCSO requested that she perform a data extraction on a Samsung Galaxy cell phone in December 2019. Special Agent Mackey stated that Facebook Messenger messages on the phone were labeled as being sent by "Matt Wood" and that user account data on the phone included "various email addresses that contained the name Matt and Wood." Special Agent Mackey identified a series of messages from her report, which was received as an exhibit.[4] Special Agent Mackey read aloud the "can't find a woman" message; the "bathtub lab" message; the "need any zs" message; and the "stockpiling" message.

On cross-examination, Special Agent Mackey testified that people sometimes access other people's Facebook accounts without the account holder's permission.

Sergeant Barnes testified consistently with his suppression hearing testimony. In addition, he stated that Defendant's pistol was loaded with eight rounds of ammunition and that it had one round in the chamber.

Sergeant Barnes testified that the methamphetamine pipe contained methamphetamine residue. Sergeant Barnes stated that he arrested Defendant and that, when Defendant emptied his pockets, he had a cell phone, $470 in cash, and a baggie containing "approximately six-and-a-half grams of methamphetamine." Sergeant Barnes stated that he weighed the drugs in the field with a scale that he had never calibrated; he explained that the sheriff's office relied on the TBI laboratory's weight for drug offenses. Sergeant Barnes testified that the methamphetamine was in "very large shards . . . which is . . . indicative of something used for res[ale] because it hasn't been cut down yet." He noted that the cash was seized through civil forfeiture.

On cross-examination, Sergeant Barnes testified that his field weight probably included the plastic bag. He agreed that the methamphetamine was in a single bag and that he did not find "drug ledgers" or scales. Sergeant Barnes stated that the residue in the pipe was not tested. Sergeant Barnes agreed that he asked Defendant if he "ever tr[ied] to get help to stop using" and that he offered to have Defendant "work these charges off" as an

---

[4] The trial exhibits were not included in the record on appeal.

- 8 -

informant performing controlled drug buys. When asked whether PCSO "let big drug dealers just work charges off," Sergeant Barnes responded, "Usually . . . after somebody has been arrested, they're going to start asking questions about . . . can I help you guys, can I do anything to help myself, and . . . as a patrol officer, that's really the only avenue we have is work with our drug detective." When asked whether he stated to Defendant that Defendant was an addict, Sergeant Barnes responded, "I don't recall saying that, no." Sergeant Barnes also did not recall asking Defendant about his job.

At this point, defense counsel requested to refresh Sergeant Barnes's recollection of the statements he made to Defendant with the body camera recording. The following exchange occurred:

> [THE STATE]: I would question the continued relevance of the question he asked because the implication here is that he responded, and I would --
>
> THE COURT: Well --
>
> [DEFENSE COUNSEL]: It's for the officer's opinion as to [Defendant]'s status as an addict and the fact that he goes -- everything he asked about. He doesn't ask anything about who are you selling to. It's all why are you using.

During the lunch break, defense counsel played the body camera recording for Sergeant Barnes; the recording was not marked for identification or made an exhibit. The State raised an objection under Tennessee Rule of Evidence 403, stating:

> [Defense counsel] knows as well as I do that very early on in that conversation [Defendant], in response to a question, says he's an addict and these are what these questions follow through.
>
> This is a very interesting way to try to skirt self-serving hearsay, but I would submit to you that these questions that he asked [Defendant] have no probative value whatsoever without [Defendant]'s responses. I have no intention of putting [Defendant]'s responses into evidence and [defense counsel] can't.

The trial court stated:

> Is there an initial question from the officer about addiction? . . . . Then the other one I heard was, "You're an addict," but that's just a statement. And

is there an initial time where the officer, unprompted, asked the question based upon, in the sally port, the evidence that has been recovered.  I do think it's relevant or probative if that can be established, but if what is the truth is that [Defendant]'s self-serving hearsay he announces first and initially that I'm an addict, then all of the officer's statements would be excluded.  Is there an initial question?

. . . .

[THE STATE]: It's very early on in the video.  They're at the hood of the car.  He's emptying his pockets.

THE COURT: . . . . I do think it would be relevant.  The officer . . . has talked about -- I believe that's lay opinion [Tennessee] Rule [of Evidence] 701, talked about shards, talked about quantity, talked about observations of methamphetamine users.  And so if it can be established . . . that really unprompted by [D]efendant's own self-serving hearsay that the officer just makes the proclamation based upon everything that has been seized and everything is known, you're an addict, I do think it would be relevant and admissible.  However, if that's just a restatement by the officer of what [Defendant] said . . . then I'm going to exclude it and it will be a back door attempt to get in self-serving hearsay.

[THE STATE]: I mean, Your Honor, if he didn't care -- he's asking a question for a reason.  I mean, this is . . . an incomplete conversation and the jury is left to speculate presumably that he nods along . . . , and it's an invitation for them to fill in the blanks.  Again, I think this has no probative value without the answers.

[DEFENSE COUNSEL]: I think that my point is that the question presumes the officer's knowledge that he knows that [Defendant] was using.

. . . .

THE COURT: I'm going to rule that question, . . . I view it more as an attempt to impeach the [Rule] 701 proof of a lay witness that has come in on direct regarding shards and what the officer has opined is for resale.  I'm going to rule that the question, "Isn't it true, Officer, that you asked [D]efendant if he had ever gotten help to try to stop using," and I also think it bears on the money issue for impeachment that isn't it true that you asked [D]efendant . . . , "You used to have a good job, didn't you?"  I'm going to admit those two

- 10 -

because while I do agree in a vacuum that the relevancy of questions without answers is low, I do think that both questions could be a means of impeachment or attempted impeachment by defense counsel to attempt to mitigate some of the officer's direct evidence 701 opinion about weight, money, and shards, and that it being for resale. Everything else I'm going to agree with the State and exclude. So if you want to take these two post-it notes, I will allow in blocks counsel to ask about those two only.

. . . .

[DEFENSE COUNSEL]: And I'm not allowed to ask about the "you're an addict" statement?

THE COURT: That's correct.

[DEFENSE COUNSEL]: Okay.

THE COURT: Because I think that's just a factual assertion that goes back and rooted in what his self-serving hearsay is.

When testimony resumed, Sergeant Barnes agreed that he asked Defendant if he ever got help to "try to stop using" and asked whether Defendant "used to have a good paying job[.]"

Sergeant Barnes testified that methamphetamine use caused rapid and irregular heartbeat, elevated blood pressure, and increased breath rate. He stated, "[A] lot of people who are . . . really actually high on meth, they're . . . we call it geeking out. You know, they can't stay still. They're all over the place. Sometimes they'll be sweating profusely. They ramble. They're incoherent." When asked if a person's being high could "manifest as extreme nervousness," Sergeant Barnes responded negatively. He stated that, at the time of the traffic stop, he did not believe Defendant was high, just "really nervous." Sergeant Barnes said that people were usually nervous during traffic stops because they had active arrest warrants or had something they did not want him to find.

Sergeant Barnes testified that, although his police cruiser had a dashboard camera, it had never worked; he noted that PCSO was a "poor rural agency" and that it was common not to replace a broken dashboard camera. He acknowledged that his body camera did not record the entire traffic stop. Sergeant Barnes explained that there was no way to know if the camera was actually recording until he connected the camera to his computer at the police station. Sergeant Barnes noted that he downloaded all the videos from a shift at once and generally did not review the individual videos at that time.

- 11 -

On redirect examination, Sergeant Barnes stated that he would have charged Defendant with driving under the influence if he believed Defendant was under the influence.

Former[5] PCSO narcotics Detective Jake Wallace testified that conducted controlled drug buys and arrested methamphetamine users and dealers. He estimated that a gram of methamphetamine cost between $70 and $100; the controlled methamphetamine buys he supervised usually involved between half a gram and two grams.

On cross-examination, Detective Wallace estimated that a "moderately heavy" methamphetamine user would consume between half a gram and one gram per day. He stated that how long a person remained "high" depended on the method of ingestion. Detective Wallace acknowledged the possibility that six and a half or seven grams of methamphetamine might last "a few days." Detective Wallace agreed that he was generally familiar with Defendant from seeing him around town and that he knew Defendant collected and sold tree moss.

On redirect examination, Detective Wallace testified that it would be uncommon for a person to use six or seven grams of methamphetamine in a couple days. He noted that he did not often see a person's "stockpiling for several days." Detective Wallace stated, "[W]hen we arrested . . . low level users, they're usually going to have maybe .2, .3 grams, maybe a gram on them. You just don't see users buying . . . several grams at a time keeping it on them." He agreed that methamphetamine users were often impoverished because they spent their money on drugs. Detective Wallace stated that seven grams of methamphetamine would cost around $490, which he opined was a lot of money to a drug user. Detective Wallace said that the term "re-up" referred to when a drug dealer bought a large amount of drugs to "re-up his supply to sell."

TBI Special Agent forensic scientist Carolyne Simpson, an expert in forensic chemistry, testified that she tested the substance seized from Defendant and identified it as seven grams of methamphetamine.

After the State rested its case, Defendant elected to testify.[6] Defendant stated that, on the day in question, he was driving to a friend's house when he turned in front of Sergeant Barnes. Defendant continued:

---

[5] Detective Wallace was working for a police department in Wyoming at the time of trial.
[6] Defense counsel and the State agreed that counsel would facilitate Defendant's narrative testimony.

- 12 -

I drove up to a man's house . . . . I stopped and got off my side-by-side. I was driving a RZR 800. I got out of it, knocked on his door. Barnes stopped beside me. He pulled up and stopped beside my side-by-side, so I walked from the door back over to see what he needed.

As I approached his car, he drove off. He sped off and went up the road, and he turned around and he sat up there stalking me is what he was doing.

Defendant stated that he briefly talked to his friend and left the house. He continued:

So I went, got back on my side-by-side, and turned around and headed back down Colonial Avenue to Belltown Road, and I turned right, and [Sergeant Barnes] was behind me. He left his stalking spot, got behind me, followed me three or four miles up the road.

I was going uphill and he blue-lighted me, so I pulled over. And he walked up to the vehicle and he said, "Oh, by the way, you got a brake light out." I was going uphill. I wasn't touching my brakes. And . . . if I had a brake light out, he should have told me back there at the house I stopped at, you know, but he didn't.

He asked me if I had anything he needed to know about on me. I told him I had a knife in my pocket and stuff. He said, "What do you mean by stuff?" I told him I had a loaded gun in my pocket. And he told me to get out.

So I gave him the gun, that way he wouldn't feel threatened. The[re] ain't no law against carrying a gun, but I told him [to] make sure he knew so he wouldn't feel threatened and I wind up dead like my buddy did, you know, back in November.

And so then he asked about the -- I told him about that I had some dope in my pocket. I didn't know what it was. I figured that they have to test it and tell me everything that was in it. I know it wasn't pure meth. I know it wasn't.

And so then I gave him the pipe and the dope, and he put me in the car. And we got to talking and . . . he asked me if I wanted to talk to a detective, and I told him, no, I couldn't do that. I didn't want to do that. And he was -- I told him, I said, "I got felonies. I won't be able to get a job

- 13 -

nowhere worth a f**k now." And excuse my language, but that's what I said, you know.

And so then he told me that I have to be found guilty. He said that's just what I'm being charged with is . . . possession of drugs or meth, whatever like that, and brake light, and I don't even think he said anything about the gun whenever we was talking. And he told me I could get my side-by-side back if I pay Boring's tow bill. He said they won't even incarcerate me or nothing down here. And I said, "All right. No, I don't want to talk to the detective, you know. I'll take my chances in court."

And on the way to jail, they stopped at the dispatch spot in Ducktown and . . . . he got out and went inside, and I sat in the car for a while. And then . . . Jake Wallace . . . . come up in, like, a Durango. He got out and introduced hi[m]self, and they took me inside, made me talk to him, and I didn't want to. And he offered me a job.

He said, "I want to offer you a job." And I said, "No, I can't. I can't do that." And he got mad and started throwing stuff saying, "Oh, yes, you will. You'll work for me. You'll work for me." I said, "I can't do it." I was crying and everything, upset.

And that's when he said, "Well, I'm going to add charges to it." That's when they added all the manufacturing, transport, and all -- they added all kinds of B.S. to it. And he said, "All the money in your wallet, it's mine. I'm taking it." He stuck his sticky little fingers down in my wallet, pulled all the cash out, put it in his front pocket, and took my vehicle.

And while he was telling me, he said that I left the guy's house that's a known drug dealer. He said he loads kilos a week and s**t like that. I said, "I don't know whether he is or not." And he said [that the dealer] come outside, slamming the door on [my] vehicle, telling me to get the hell out of there. And I said, "No, he didn't." I said, "None of that happened." There wasn't no doors on what I was driving, so I knew he didn't know . . . what happened or anything. Barnes poked his head in the door and even told him that that ain't what happened.

When asked whether he had anything else to say in his defense, Defendant stated that he did not know if the substance he had was methamphetamine; he noted, "They got to test it grain for grain, everything, every amount, what cut's in there and all that stuff. I know it wasn't pure meth." He continued:

- 14 -

I've been d**ked around for -- for the past five years I've been trying to get the fastest speedy trial by jury for five years. And, no, I've been denied everything.

. . . .

I've been threate[ne]d. I've been promised and everything into taking a plea . . . . [T]he sheriff told me it would be a rough and rocky road for me if I don't take the plea. [A previous attorney] told me I'm going to commit suicide if I don't take the plea. My sister winds up killing herself over it. I mean, I've been put through hell.

People's coming by there messing with my truck, knocking the front end out of alignment . . . . I don't know if the cops are or what. I mean, I'm serious. I've been a nervous wreck for the past five years. I don't know why.

This don't happen. It's my first drug offense, I mean, first time ever. This don't happen to nobody. I've lost nearly . . . everything in my retirement, my 401(k), every bit of it is gone. I don't know where it went.

When shown the bag of methamphetamine, Defendant denied that it was his. Defendant stated that he did not memorize the serial number of his pistol, but he had it written down at home.

On cross-examination, Defendant testified that he did not know if the cell phone was his; he noted that Sergeant Barnes took two phones from him. When asked whether it was likely the phone was his if it was logged into his email and Facebook accounts, Defendant responded negatively. He stated that he knew "for a fact that somebody's logged in on [his] accounts" and that he had asked defense counsel to investigate it. Defendant noted that he wanted to give defense counsel cell phones he had at home and that counsel told him, "Oh, no, they don't do that. The State won't do that. They're trying to prosecute you." Defendant stated that he responded, "It seems like if somebody [is] tampering with evidence and framing people the State would want to know."

When asked how long he had been using methamphetamine, Defendant responded, "Who says I've ever used it?" Defendant noted that he did not know if he was "on" methamphetamine on the day of his arrest and that he had asked to be drug tested, but the police refused. When asked if he was on methamphetamine at trial, Defendant responded negatively. Defendant did not know if long-term methamphetamine use caused paranoia. When asked whether long-term methamphetamine use caused delusions, Defendant

responded, "I know what happened . . . .  I called the FBI last week and told them about it."

Defendant testified that he told defense counsel that he did not know what he had or whether the drugs were "pure meth."  Defendant averred that he told Sergeant Barnes that he had a "dope" pipe rather than a methamphetamine pipe.  When asked what he thought the white crystal substance was, Defendant stated, "Dope."  He added that he was told that it was methamphetamine but reiterated that he knew it was not pure.  Defendant stated that the police refused to send any substance for TBI testing unless a murder was involved or the drugs weighed more than one ounce.  Defendant said that he had seen laboratory reports belonging to other inmates who had "real drug charges" and that they "showed grain for grain everything that was in there . . . .  Like if there was fentanyl in it, heroin, whatnot, they test for everything."  When asked whether he believed his drug charge was "fake," Defendant responded, "I don't even know if I had an illegal drug.  It could have been one of them research drugs or something.  I mean, the cops could have been putting it out there the way they're treating me."  Defendant agreed that sending a drug to a laboratory for testing was a good way to identify it.

When asked about the "can't find a woman" message, Defendant responded that he knew that "they" were logged in to his account and that he "was saying s**t, just unbelievable bulls**t to see how they'd run with it."  He also stated that he said "all kinds of s**t like that on [his] phone texting people."  Defendant stated:

> Somebody was at Barnes's house because it showed up on my Google Map. It was either him logged in on my account or somebody -- snitch or something was at his house because I seen it on my d**n location.  I had screenshots of it on the phones that they took from me.  And there's a lot -- there's a lot of messages on them d**n phones too other than that.  There's a bunch that can put Polk County away too.

Defendant denied that he was a drug dealer.  When asked whether he sent a text message asking a person if he wanted to "split half a key," Defendant stated that he did not remember, that it was five years ago, that he "said stuff like that all the time," and that, if the messages were "in there," he was "sure [he] did or either they put it in there, one." Defendant denied, though, that he told the person he would obtain a price for the key. Defendant noted that he used to drink a lot and that "there ain't no telling what [he] said in those messages" because he got "p***ed off at the cops and . . . just message all kind of s**t."  He noted, "I've looked at stuff and screenshot it that I know I didn't do."

When asked about a September 2019 text message exchange in which Defendant arranged to go to a woman's work, take $75 from her car's ashtray, and trade her drugs,

Defendant did not remember the exchange. Defendant also did not remember a December 2019 exchange in which Donald Brown offered him $270 and some Xanax for an ounce of methamphetamine. However, when asked whether he sent the "red rock crank" message, Defendant responded that he "probably did say that."

Defendant stated, "If I'm a dealer, who did I sell it to? Why ain't they up here? Where did I take it? . . . . Do you recall who you texted October the 12th, 2019? Do you remember? Then why the hell would I?" He said that, if he were a drug dealer, he "would have a real lawyer, someone would be up here to defend [him]."

Defendant agreed that the man whose house he visited on December 1, 2019, was a known drug dealer; he noted that the man was deceased. Defendant averred that he was truthful with Sergeant Barnes when he denied having bought drugs from the man that day.

Upon this evidence, the jury convicted Defendant of the lesser-included offense of attempted possession of methamphetamine with the intent to sell or deliver; possession of a firearm during the attempted commission of a dangerous felony; and possession of drug paraphernalia.

Before the sentencing hearing, on May 6, 2024, Defendant filed a pro se notice of appeal while still represented by defense counsel. After the July 26, 2024 sentencing hearing, the trial court imposed a sentence of three years' confinement followed by four years of supervised probation. Defense counsel filed a "skeleton" motion for new trial and indicated that his representation agreement ended after sentencing. On July 29, 2024, the trial court allowed defense counsel to withdraw but did not appoint new counsel. On August 15, 2024, Defendant filed a motion in this court to appoint appellate counsel.

In response, this court entered an order remanding the case to the trial court for a determination of Defendant's indigency status and for the appointment of counsel for the motion for new trial proceedings. Order, *State v. Wood*, E2024-00678-CCA-R3-CD (Tenn. Crim. App. Aug. 15, 2024).

On October 28, 2024, the trial court appointed the Public Defender's Office to represent Defendant, and newly appointed counsel filed a motion in this court to dismiss the appeal pending the outcome of the motion for new trial proceedings. This court denied the motion, noting that "[w]hen a notice of appeal is filed prematurely, the trial court retains jurisdiction over a timely filed motion for new trial." Order, *id.* (Tenn. Crim. App. Nov. 7, 2024); *see* Tenn. R. App. P. 4(d), (e).

Defendant subsequently filed an amended motion for new trial, which raised four issues: that the trial court erred by denying the motion to suppress; that the trial court erred

- 17 -

by admitting the text messages pursuant to Tennessee Rule of Evidence 404(b); that the evidence was generally insufficient to support his convictions; and that the trial court erred by not allowing Defendant to "elicit a statement" from Sergeant Barnes that Defendant was an addict. The trial court denied the motion for new trial. This appeal follows.

## II. Analysis

### A. Suppression

Defendant contends that Sergeant Barnes lacked reasonable suspicion to stop his vehicle, arguing that the GovDeals Marketplace listing "challenged" Sergeant Barnes's testimony that his brake light was not functioning. He asserts that Detective Day performed no work on the brake lights and that "it is reasonable that if the brake lights were working during the sale . . . they were working at the time of the traffic stop." The State responds that the record supports the trial court's conclusion that the traffic stop was supported by probable cause.

The applicable standard of review for suppression issues is well-established. A trial court's findings of fact are binding on this court unless the evidence in the record preponderates against them. *State v. Echols*, 382 S.W.3d 266, 277 (Tenn. 2012) (citing *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Id*. The prevailing party is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing and all reasonable and legitimate inferences that may be drawn therefrom. *Id*. The trial court's application of law to the facts is reviewed under a de novo standard with no presumption of correctness. *Id*. (citing *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001)). When reviewing a trial court's ruling on a motion to suppress, this court may consider the entire record, including the proof presented at the suppression hearing as well as at trial. *State v. Thacker*, 164 S.W.3d 208, 248 (Tenn. 2005); *Walton*, 41 S.W.3d at 81; *State v. Henning*, 975 S.W.2d 290, 297-99 (Tenn. 1998). "Findings of fact made by the trial judge after an evidentiary hearing of a motion to suppress are afforded the weight of a jury verdict, and this court will not set aside the trial court's judgment unless the evidence contained in the record preponderates against [the trial judge's] findings." *State v. Adams*, 859 S.W.2d 359, 362 (Tenn. Crim. App. 1992).

Generally, "under both the federal and state constitutions, a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997) (citing *Coolidge v. New Hampshire*, 403 U.S.

443, 454-55 (1971); *State v. Bartram*, 925 S.W.2d 227, 229-30 (Tenn. 1996)). "Individuals do not lose their constitutional protections against unreasonable searches and seizures by getting into an automobile." *State v. Smith*, 484 S.W.3d 393, 400 (Tenn. 2016) (citing *Delaware v. Prouse*, 440 U.S. 648, 662-63 (1979)); *see State v. Troxell*, 78 S.W.3d 866, 871 (Tenn. 2002). If an officer has probable cause or reasonable suspicion to believe that a motorist has committed a traffic offense, an investigatory stop is constitutional. *Smith*, 484 S.W.3d at 400-01.

As a preliminary matter, we acknowledge the State's position that Defendant has risked waiver by failing to provide the suppression motion in the appellate record. When a party seeks appellate review, he has a duty to prepare a record that conveys a complete account of what transpired as to the issues forming the basis of his appeal. *State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993). "When the record is incomplete, or does not contain the proceedings relevant to an issue, this [c]ourt is precluded from considering the issue." *State v. Miller*, 737 S.W.2d 556, 558 (Tenn. Crim. App. 1987). Likewise, "this [c]ourt must conclusively presume that the ruling of the trial court was correct in all particulars." *Id.* (citations omitted). We conclude, however, that the record is sufficient for us to consider Defendant's issue—defense counsel's argument, the State's response, and the trial court's findings and reasoning are apparent from the suppression hearing transcript.

Defendant's argument centers on credibility and the weight of the evidence. Specifically, he asserts that Sergeant Barnes's testimony that the right brake light was not functional was uncorroborated and was contradicted by Detective Day's testimony and the GovDeals Marketplace listing and video. We do not accept Defendant's invitation to disturb the trial court's credibility determinations. *See Echols*, 382 S.W.3d at 277.

We note that because Defendant failed to include the suppression hearing exhibits in the appellate record, this court must presume that the trial court's findings relative to the exhibits are correct. *See Miller*, 737 S.W.2d at 558. In addition, Defendant ignores Detective Day's testimony that he did not inspect the vehicle thoroughly, that he did not know if the taillight and the brake light shared a bulb, and that the video showed the vehicle parked with the engine running, not when the brakes would have been engaged.

In sum, the record before us supports the trial court's findings that the GovDeals Marketplace listing and video did not contradict Sergeant Barnes's accredited testimony that the brake light was out and that the stop was supported by probable cause. Defendant is not entitled to relief on this basis.

*B. Prior Bad Acts*

Defendant contends that the trial court erred by admitting, under Tennessee Rule of Evidence 404(b), three text messages that were offered in the State's case in chief regarding prior drug transactions, arguing that they were offered to show Defendant's propensity to sell drugs. Defendant asserts, without citation to authority, "This use of the text messages by the State runs afoul with a litany of cases that discuss the perils of unfair prejudice that arise should the State attempt to introduce evidence of character in an attempt to prove intent." The State responds that the trial court did not abuse its discretion in admitting the messages.

Rule 404(b) of the Tennessee Rules of Evidence provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b); *see also Thacker*, 164 S.W.3d at 240; *State v. Parton*, 694 S.W.2d 299, 302 (Tenn. 1985). Rule 404(b) is generally one of exclusion, but exceptions to the rule may occur when the evidence of the otherwise inadmissible conduct is offered to prove the motive of the defendant, identity, intent, the absence of mistake or accident, opportunity, or a common scheme or plan. *State v. Toliver*, 117 S.W.3d 216, 230 (Tenn. 2003); *State v. McCary*, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003).

If the trial court substantially complies with the procedural requirements of Rule 404(b), we will review the trial court's determination for an abuse of discretion. *Thacker*,

164 S.W.3d at 240 (citing *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997)); *State v. Baker*, 785 S.W.2d 132, 134 (Tenn. Crim. App. 1990)). However, if the trial court fails to substantially comply with the requirements of the rule, then the trial court's decision should be afforded no deference by the reviewing court. *DuBose*, 953 S.W.2d at 652.

Here, the trial court complied with the procedural requirements of Rule 404(b) by holding a pretrial hearing. Reading the hearing transcript and written order in tandem, relative to the "can't find a woman," "bathtub lab," and "need any zs" messages, the trial court found that the State proved the prior acts by clear and convincing evidence, that the messages were relevant to Defendant's intent, and that the probative value outweighed the risk of unfair prejudice. The court also noted that the "need any zs" message was only admitted to give context to the "red rock crank" message. Thus, we will review the trial court's decision to admit these three messages for an abuse of discretion. *Thacker*, 164 S.W.3d at 240 (citing *DuBose*, 953 S.W.2d at 652); *Baker*, 785 S.W.2d at 134.

The trial court did not abuse its discretion in admitting the messages. The trial court reasonably concluded that the text messages were probative of Defendant's intent to sell or deliver methamphetamine in the weeks leading up to the incident in this case. We note that the court exercised restraint and carefully considered the risk of unfair prejudice to Defendant in rendering its decision, which resulted in the exclusion of ninety text messages sought to be introduced by the State.

Relative to the "stockpiling" message, the trial court discussed it and initially excluded it in its oral findings, but later stated that it was admissible in its written order. "[T]o the extent that the trial court's oral findings may conflict with its written order, we will focus our review on the written order." *State v. McCulloch*, E2021-00404-CCA-R3-CD, 2022 WL 2348568, at *12 (Tenn. Crim. App. June 29, 2022), *perm. app. denied* (Tenn. Dec. 14, 2022); *see Williams v. City of Burns*, 465 S.W.3d 96, 119 (Tenn. 2015). The trial court did not find in the written order that the message established a prior bad act by clear and convincing evidence, and it did not weigh the probative value and danger of unfair prejudice. The court generally stated that it was excluding ninety other messages because "they are not clear and convincing [evidence] of prior bad acts and/or any probative value is outweighed by the danger of unfair prejudice." After careful review, we conclude that the trial court's written order does not substantially comply with Rule 404(b)'s procedural requirements relative to the "stockpiling" message. Accordingly, we will review its decision without deference based upon the evidence presented at the hearing.

We conclude that the message established by clear and convincing evidence that, in October 2019, Defendant discussed with Mr. Brown that he had a supply of methamphetamine he was keeping as an investment; he specifically mentioned that he knew the price would increase over time. The "stockpiling" message had a high probative

value related to Defendant's intent to sell or deliver methamphetamine on December 1, 2019, which we conclude outweighed the danger of unfair prejudice. The trial court did not err in its decision to admit the message.[7]

We note that the jury was instructed that the messages were not to be considered as propensity evidence, but only as evidence of Defendant's intent to sell or deliver the methamphetamine on the date in question. The jury is presumed to follow the trial court's instructions. *State v. Banks*, 271 S.W.3d 90, 137 (Tenn. 2008), *overruled on other grounds by State v. Enix*, 653 S.W.3d 692, 701 (Tenn. 2022). Defendant is not entitled to relief on this basis.

*C. Limit on Cross-Examination*

Defendant contends that the trial court infringed on his constitutional right to present a defense by limiting his cross-examination of Sergeant Barnes. Specifically, he argues that defense counsel should have been allowed to ask Sergeant Barnes—after refreshing his recollection—whether he stated to Defendant, "You're an addict." Defendant asserts that the statement was "not a question asked to [e]licit a statement" from him from but that rather it was "exculpatory evidence" of a "proclamation that [Sergeant] Barnes made based upon his observation and investigation into the totality of the circumstances." Defendant argues that the statement was "highly relevant" to rebut the State's proof that Defendant was a drug dealer. The State responds that Defendant has waived consideration of this issue for failing to make the body camera recording part of the record on appeal.

"Exclusions of evidence may violate the Due Process Clause of the Fourteenth Amendment of the United States Constitution even if the exclusions comply with rules of evidence." *State v. Flood*, 219 S.W.3d 307, 315-16 (Tenn. 2007). "Principles of due process require that a defendant in a criminal trial ha[s] the right to present a defense and to offer testimony." *Id.* at 316 (citing *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973); *State v. Brown*, 29 S.W.3d 427, 431 (Tenn. 2000)). In *Washington v. Texas*, the United States Supreme Court stated:

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their

---

[7] We note that the State addresses the "red rock crank" message in its brief but does not address the "stockpiling" message. Although the trial court found at the pretrial hearing that the "red rock crank" message was admissible, the State only utilized it for impeachment purposes during Defendant's cross-examination. Defendant has not contested the admissibility of the messages used to impeach his credibility.

testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

388 U.S. 14, 19 (1967).

The right to present witnesses, while of critical importance, is not absolute. *Brown*, 29 S.W.3d at 432 (quoting *Chambers*, 410 U.S at 295). "In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence . . . ." *Chambers*, 410 U.S. at 302. Rules of procedure and evidence are designed to assure fairness and reliability in the criminal trial process. *Id.* "So long as the rules of procedure and evidence are not applied arbitrarily or disproportionately to defeat the purposes they are designed to serve, these rules do not violate a defendant's right to present a defense." *Flood*, 219 S.W.3d at 316 (citing *United States v. Scheffer*, 523 U.S. 303, 308 (1998)). To determine if an evidentiary ruling violates a defendant's right to present a defense, an appellate court must employ an analysis considering whether: "(1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting exclusion of the evidence is substantially important." *Brown*, 29 S.W.3d at 433-34 (citing *Chambers*, 410 U.S. at 298-301); *accord State v. Rimmer*, 623 S.W.3d 235, 279 (Tenn. 2021).

We agree with the State that, without seeing the body camera recording, we cannot assess Defendant's specific claim that the trial court erred by misinterpreting Sergeant Barnes's words, which Defendant claims was an affirmative statement or opinion, as opposed to a question. Although the recording was played at the suppression hearing and during the jury-out hearing, it was not exhibited to either record. Defendant has waived our consideration of this issue for failure to provide an adequate record. *See Miller*, 737 S.W.2d at 558.

In addition, Defendant has waived our consideration of this issue because, in the motion for new trial and corresponding hearing, he failed to clearly state the legal authority under which he raised it. The amended motion for new trial stated that the trial court "erred in granting the State's motion to exclude the [d]efense from asking [Sergeant] Barnes if he remembered telling [] Defendant 'you're an addict' during his interaction with him on the traffic stop in question." At the motion for new trial hearing, defense counsel stated:

I believe that was in error because that did go toward the defense's theory that [Defendant] was a drug addict . . . . I think it would be a balancing avenue that the [c]ourt would look at saying, "Okay. If this was an error, is it harmless?" Because the defense, they have the right to put the defense in front of the jury. Without that piece, would that be harmless error, and that's the [c]ourt's decision to make.

- 23 -

Stating that evidence would have supported the defense theory and generally observing that Defendant had the right to "put the defense in front of the jury" is not the same as alleging a violation of one's constitutional right to present a defense. "It is well-settled that an appellant is bound by the evidentiary theory set forth at trial, and may not change theories on appeal." *State v. Alder*, 71 S.W.3d 299, 303 (Tenn. Crim. App. 2001) (citation omitted); *see State v. Vance*, 596 S.W.3d 229, 253 (Tenn. 2020) (stating that appellate review "generally is limited to issues that a party properly preserved for review by raising the issues in the trial court and on appeal") (citations omitted). Because the trial record is murky as to the legal basis for Defendant's argument, the issue has been waived.

We briefly note, however, that the testimony defense counsel sought to elicit from Sergeant Barnes, *i.e.*, that he had opined had Defendant was an addict, was not "critical to the defense." *Brown*, 29 S.W.3d at 434. Even assuming for the sake of argument that Sergeant Barnes was expressing an opinion, given the strength of the State's case— particularly the text message exhibits—the defense theory's success or failure did not turn on this single statement. As we discuss below, the evidence was sufficient to support Defendant's convictions, and the defense theory was at least partially successful because the jury returned a verdict on a lesser-included offense in Count 1.

## D. Sufficiency of the Evidence

Defendant asserts that the evidence was insufficient to establish his intent to sell or deliver methamphetamine relative to his conviction in Count 1, attempted possession of methamphetamine, and the predicate dangerous felony for Count 2, possession of a firearm during the attempt to commit a dangerous felony. Defendant does not dispute the sufficiency of the remaining elements of the offenses in Counts 1 and 2; likewise, he concedes that the evidence was sufficient to support his conviction in Count 3, possession of drug paraphernalia. The State responds that the evidence is sufficient to support Defendant's convictions.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and the weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

It is an offense to knowingly possess a controlled substance with the intent to sell or deliver the controlled substance. Tenn. Code Ann. § 39-17-417(a)(4) (2019). A person "acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." Tenn. Code Ann. § 39-11-302(b). Methamphetamine is a Schedule II controlled substance. Tenn. Code Ann. § 39-17-408(d)(2) (2019).

Proof of intent to sell or deliver usually consists of circumstantial evidence and the inferences that can be reasonably drawn from that evidence. *See Hall v. State*, 490 S.W.2d 495, 496 (Tenn. 1973); *State v. Washington*, 658 S.W.2d 144, 146 (Tenn. Crim. App. 1983) (observing that a jury may derive a defendant's intent from both direct and circumstantial evidence). The jury may infer "from the amount of a controlled substance or substances possessed by an offender, along with other relevant facts surrounding the arrest, that the controlled substance or substances were possessed with the purpose of selling or otherwise dispensing" in violation of § 39-17-417(a). Tenn. Code Ann. § 39-17-419 (2019).

A person commits criminal attempt when, acting with the kind of culpability otherwise required for the offense, he:

> (1) intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be; (2) acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or (3) acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

*Id.* § 39-12-101(a).

- 25 -

When viewed in the light most favorable to the State, the evidence presented at trial shows that Defendant intended to complete a course of action resulting in the sale or delivery of more than 0.5 grams of methamphetamine and that his conduct constituted a substantial step toward its commission. Sergeant Barnes noted that the methamphetamine Defendant had was in large shards, indicating that it had not yet been broken down into powder for resale. Detective Wallace testified that it would be unusual for a drug user to buy seven grams of methamphetamine at once, and he described a "re-up" as a situation in which a drug dealer replenishes his supply from a supplier. Defendant was carrying $470 in cash. Special Agent Mackey identified text messages from Defendant's cell phone sent in October and November 2019, in which he stated that (1) in spite of having a half-pound of "s**t, he could not find a "dope w**re to f**k him," implicitly in exchange for the "s**t"; and (2) he could trade moss for "good quality product, straight from a bathtub lab in [the] remote Tennessee mountains before the Mexicans put their cut in it."

Based upon the text messages, the relatively large amount of methamphetamine and the cash on Defendant's person, and the methamphetamine's being in larger shards, the jury could reasonably conclude that Defendant committed a substantial step toward knowingly possessing methamphetamine with the intent to sell or deliver. *See e.g., State v. Ross*, 49 S.W.3d 833, 845 (Tenn. 2001). We note that the evidence would have been sufficient for the jury to convict Defendant as charged. Defendant is not entitled to relief.

### III. Conclusion

Based upon the foregoing, we affirm the judgments of the trial court.

s/*Robert L. Holloway, Jr.*

ROBERT L. HOLLOWAY, JR., JUDGE

- 26 -